# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :        Chapter 11
                                                   :
FRASCELLA ENTERPRISES, INC.,                       :        Bankruptcy No. 06-10322DWS
dba Cash Today,                                    :
                                                   :
        Debtor.                                    :

---

# OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court are (1) the request for confirmation of the Amended Plan of
Reorganization (the "Plan") proposed by Frascella Enterprises, Inc. d/b/a Cash Today
(the "Debtor") and (2) the Motion of creditors Lawrence Turner, Linda Davis and
Demyri Hill (together with the class they seek to represent, the "Consumers") for Estimation
of their Class Claim ("Estimation Motion").  The Debtor opposed the Estimation Motion on
various procedural and substantive grounds.  Certain of those objections were overruled for
the reasons stated herein and on the record, and an estimation hearing was held prior to the
plan confirmation hearing.[1]  The Consumers were the sole objectors to confirmation,[2]
and without regard to their yet to be quantified claim, all other classes of creditors voted to
accept the Plan.

---

[1]  To prevent delay, the parties agreed to go forward with the confirmation hearing at the
conclusion of the claim estimation hearing rather than await the ruling on the Estimation Motion.
The Debtor was also afforded the further opportunity of responding to the Estimation Motion by
filing a memorandum which has now been received.

[2]   The Debtor resolved an objection filed by the Commonwealth of Pennsylvania,
Department of Revenue.  The United States Trustee ("UST"), while raising a number of questions
about the contemplated reorganization as discussed below, did not take a position on confirmation.

## BACKGROUND

Introduction. The Debtor is presently in the business of operating check cashing retail stores. Its expenses which have exceeded its income have been borne by affiliated companies through intercompany transfers and joint management arrangements. Exhibit T-1. The three remaining check cashing stores are to be closed and their assets liquidated upon confirmation.[3] Instead the objective of the Debtor's reorganization is to resume the payday lending business[4] discontinued by the Debtor in 2005 when Pennsylvania imposed restrictions on that enterprise. The Debtor intends to accomplish this through a merger with Frascella Enterprises of Delaware LLC (the "Subsidiary") which acquired the Debtor's portfolio of payday loans shortly before the Chapter 11 case was commenced and has continued to make these short term loans as a Delaware corporation. After the merger, the Subsidiary will be the surviving entity and will assume the obligations to the Debtor's unsecured creditors under the Plan. Specifically the reorganized company ("Reorganized

---

[3] One of the accomplishments of the Chapter 11 case for the Debtor has been the rejection of leases of storefront properties where it operated its loan and check cashing business.

[4] This business offers small denomination consumer loans with a short term maturity which, because they usually come due on the borrower's next pay day, are referred to as "payday loans." Exhibit D-8, Amended Disclosure Statement ("Discl. St.") at 9. The rate charged for such loans is $20 per $100 borrowed. Exhibit C-4A at 39-40. As explained by the Consumers, this represents a 520% annual rate for a two week loan. As will be discussed below, this type of loan product is not legal in Pennsylvania which imposes a 6% ceiling on loans of less than $50,000 with an exception for "consumer discount companies" which may charge 24% pursuant to the Pennsylvania Consumer Discount Company Act ("CDCA"), 7 P.S. § 6201 et seq. The Debtor does not contend that the business of the reorganized company will be licensed under the CDCA or will be operating under that exception. Rather as discussed below, the Subsidiary now and as merged with the Debtor, relies on Delaware law to legitimatize its contemplated loans to Pennsylvania consumers.

Frascella")[5] will be responsible for annual payments to unsecured creditors in the amount of $200,000 for five years commencing twelve months after the effective date of the Plan.[6] The Debtor, as well as other entities discussed below, are owned entirely by the Frascella Brothers.  The Subsidiary is, as its name implies, owned by the Debtor.

Background of the Frascella Brothers Lending Business.  In 2000 the Debtor was formed with the intention of making payday loans over the phone, internet and significantly in retail stores which would also provide check cashing services.  In anticipation of more favorable state legislation, the Debtor leased a number of storefronts to provide these loans.[7] Meanwhile, banks were not excluded from making the short term loans to borrowers whose state usury law prohibited them so long as the loan did not violate the bank's state usury law. Delaware state law does not impose a usury limitation, and thus in 2000 the Debtor formed

---

[5]  I have used this term to refer to the reorganized company and the term Subsidiary to refer to the currently existing Frascella Enterprises of Delaware, LLC.  The Debtor has used Subsidiary for both which at times was confusing.

[6]  Unsecured creditors are also to receive a pro rata share of (1) $50,000 of the $100,000 being paid by Larry and David Frascella (the "Frascella Brothers") for the purchase of the common stock of Reorganized Frascella and (2) any monies remaining in the Initial Distribution Fund (i.e., proceeds of sale of Cheltenham Property and check cashing business assets) after payment of administrative claims.  The remaining $50,000 is to be deposited in the Administrative Claim Fund, along with $200,000 deposited by the Debtor, to be used to pay legal fees incurred after the effective date in connection with the Class Action (defined below) as well as to pay any indemnification obligations to which the Frascella Brothers may be entitled.

[7]  The efficacy of the check cashing business which had allowed loans on post-dated checks was impaired when in 1998 Pennsylvania followed other states in prohibiting that practice. Discl. St. § 5.1.1.  Hoped (and lobbied) for legislative change did not materialize.

a relationship with County Bank of Rehobeth, Delaware ("County Bank")[8] whereby the Debtor would accept the loan applications over the internet, telephone or at one of its storefront offices and submit them to County Bank who would fund the loans. At the end of each day, the Debtor purchased a 90% participation in the loan portfolio (and concomitantly acquired a 90% share of the revenues earned from the loans) with County Bank retaining a 10% interest. Discl. St. § 5.2. In order to raise the capital necessary to purchase the loan participation, the Debtor borrowed from seventeen investors pursuant to promissory notes which paid monthly interest annualized at 30%. Id.[9] As of the Petition Date, the Debtor was current on its obligations to the investors but still owed them $2,270,000. See also infra p. 10.

In March 2005, the FDIC announced new regulations which would foreclose the continuation of the bank lending model described above. On March 17, 2005 the Frascella Brothers formed the Subsidiary and applied for a Delaware license to provide these loans which were not permitted under Pennsylvania usury laws. In response to the regulatory climate, County Bank exited the short-term lending business on May 1, 2005. Looking for a way to continue the payday lending business, the Debtor purchased the remaining 10% interest in the existing loan portfolio for $120,000 and turned to an affiliate, Ambassador Financial Services, Inc. ("Ambassador") as the "interim lender" for new and existing payday loans until the Subsidiary obtained a Delaware banking license to continue making the loans.

---

[8] Initially the contract was through an unidentified "intermediary sponsor." In November 2003, the Debtor had its own contract with County Bank because "it no longer needed an intermediary." Id. The significance of this structural change is not explained.

[9] The characterization "investors" is derived from the Disclosure Statement.

Discl. St. § 5.2 at 12-13.  Ambassador, as discussed below, was in the same line of business

for itself.[10]  When the Subsidiary received its Delaware license on December 23, 2005,

it presumably began to operate a payday lending business as it now intends to do after the

merger with the Debtor.

The Litigation. The Debtor's Chapter 11 case, which was filed on January 30, 2006,

has been animated by two actions, both of which the Debtor removed from the state

court shortly after filing its bankruptcy petition.  The first ("Richmond Action"), in which

Richmond Financial, Inc. alleged fraudulent transfers and civil conspiracy among the

Frascella Brothers and their various entities, including the Debtor, was settled.[11]  The other

---

[10]  The Disclosure Statement acknowledges Ambassador as the lender for the loan portfolio from July 5 through December 23, 2005 (when the Subsidiary received its Delaware license) but denies it had ownership of the portfolio.  Id.  Rather it contends that the loan portfolio with a principal balance of $1,043,020 was transferred to the Subsidiary on July 5 which thereinafter received the income therefrom.  As the legality of the Debtor's actions with respect to the loan portfolio are at issue in the pending adversary proceeding described below, I make no findings on the credibility of this explanation.  Notably the Debtor did not disclose the transfer of the loan portfolio in its initial Statement of Affairs, a gross omission that was addressed, after discovery, with the filing of a Supplemental Affidavit by Edmund George, Esquire.  That document stated that without County Bank, the Debtor could not hold, own or service the $1.2 million loan portfolio and thus it was transferred to Ambassador in exchange for a $120,000 payment to County Bank and $2.02 million of debt attributable to the portfolio.  In re Frascella, 2006 WL 1530256, at *3 (Bankr. E.D. Pa. April 12, 2006).  While George was vague as to the nature of the $2.02 liabilities Ambassador assumed, it was subsequently disclosed that the investor notes in the amount of $2,270,000 were assumed by Ambassador on January 27, 2006, a transaction that was reversed after the forensic accountant retained by the Debtor released its report and found no legal basis for the transfer.  Exhibit D-1, at 12-13 (Parente Report).

[11]  The settlement with Richmond Action liquidated and reduced its claim to $300,000 which is to be paid and secured by the Frascella Brothers.  Richmond's claim is classified as Class 3, general unsecured and has been voted in favor of the Plan.  The transfer of the loan portfolio and other prepetition insider transfers had invited the scrutiny of Richmond, which had also filed a motion for a Chapter 11 trustee.  That challenge to reorganization control was eliminated with the

(continued...)

action, which continues to define this case, is a consumer class action (the "Class Action") commenced by Lawrence Turner, Linda Davis and Demyri Hill, on behalf of themselves and all others similarly situated, against Frascella Enterprises, Inc. d/b/a Cash Today and its principals David Frascella and Larry Frascella.  Adv. No. 06-101.  The Class Action seeks redress for certain allegedly usurious short term loans made to Pennsylvania consumers by the Frascella Brothers through the Debtor d/b/a Cash Today.

While the Class Action was removed to this Court many months ago, the case has become mired in a dispute about jurisdiction.  After removing the lawsuit to federal court from the state court, the Debtor promptly filed a motion to dismiss for lack of jurisdiction, invoking the enforceability of an arbitration clause in the loan contracts it entered into with the Consumers.  In response, the Consumers averred that the arbitration provision upon which the Debtor relies is procedurally and substantively unconscionable and therefore legally unenforceable.[12]  Concluding that there were insufficient facts upon which to find

---

(...continued)
settlement whereby Richmond withdrew its motion and agreed to assign its claim on the Effective Date of the Plan to the Frascella Brothers.

[12] In a Memorandum Opinion I set forth the Consumers' position as follows:

Count VI [of the Complaint] entitled "Declaration of Contractual Unconscionability" challenges the Note provisions as unconscionable.  It alleges that the contracts are essentially adhesion contracts, the borrowers being even more desperate than the average consumer as evidenced by their need for such costly financing and thus lacking any bargaining power to negotiate any material changes to the contract's terms.  Complaint ¶¶ 142-143.  It alleges that by precluding the class action which is the only economically feasible vehicle to pursue the consumer's claims, Defendants are effectively immunizing themselves from liability.  Id. ¶ 145.  It further alleges

(continued...)

that arbitration was mandated, I denied the motion to dismiss[13] and am prepared to consider

the Debtor's motion to compel arbitration ("Arbitration Motion") on a summary judgment

record just submitted.

    The Consumers' Challenge to Confirmation.  The Consumers have filed a proof of

claim ("POC") in the amount of $7,560,000 based on alleged usury violations from 1999

to 2006.  The Debtor objected to the POC but since the merits of that dispute have been

deferred to consider the jurisdictional issue, the claim remains unliquidated.  While the

Consumers cast a Class 3 ballot to reject the Plan, the Debtor has not counted the vote as a

valid ballot for any amount.  To compel otherwise, the Consumers filed their Estimation

Motion and made a documentary record in support of it.  The resolution of the Estimation

Motion would determine whether the Debtor would require confirmation under § 1129(a)

———————————————

(...continued)

>that the designation of Delaware law insulates Defendants from accountability
>to Pennsylvania consumers under Pennsylvania law.  Id. ¶ 146.  Finally, and most
>significantly for these purposes, they allege that it would be unfair to require
>consumers to arbitrate their claims against Defendants with NAF as the exclusive
>forum because (a) its economic dependancy on its corporate clients renders it not
>nuetral; (b) NAF does not allow a litigant to have input on the selection of the
>arbitrator; (c) NAF arbitrators (as opposed to other arbitrators) tend to be creditor
>lawyers, not neutrals; (d) NAF shifts costs to a losing consumer in violation of
>Pennsylvania law; (e) NAF rules limit allowable discovery to an amount
>"commensurate with the value of the claim" effectively allowing very little discovery
>in these matters; (f) NAF rules prohibit class actions; (g) NAF rules prohibit joinder
>of claims without creditor consent effectively allowing the creditor to veto the
>joinder of multiple consumers in a non-class action.  Id. ¶ 147.  Plaintiffs conclude
>that these provisions are procedurally and substantively unconscionable and should
>be declared unenforceable as violative of Pennsylvania public policy.  Id. ¶ 148.

Turner v. Frascella Enterprises, Inc. (In re Frascella Enterprises, Inc.), 349 B.R. 421, 425-26 (Bankr.
E.D. Pa. 2006).

    [13] I also denied a companion motion by the Consumers to sever the case as to the non-Debtor
defendants.

or § 1129(b).  If Class 3 rejects the Plan, the Debtor will have the additional burden of proving that the Plan meets the best interests test of § 1129(a)(7) and is fair and equitable under the cram down provisions of § 1129(b).

In addition to its dispute with the Debtor about the allowance of its claim, the Consumers raise a number of legal objections to confirmation of the Plan:  (1) the Plan is not fair and equitable to general unsecured creditors by classifying claims of insiders *pari passu* and not subordinating them to claims of non-insider unsecured creditors; (2) the Plan improperly classifies the claims of "investors," i.e., friends and relatives of the Debtor who hold claims based on notes; (3) the Plan has been prepared by means forbidden by law insofar as it is to be funded by the operations of the Frascella Brothers' payday lending business operating through the Subsidiary; (4) the Plan will be followed by a liquidation and is not likely to succeed (i.e., it is not feasible) since it relies on the legal viability of the payday lending business; (5) the Plan impermissibly seeks to discharge all claims against the Debtor without notice to past consumers of the payday lending business who have claims under Pennsylvania usury law; and (6) the Plan violates the absolute priority rule by providing less than full payment to unsecured creditors while allowing the Frascella Brothers to retain their ownership interest.

The Confirmation Hearing.  A confirmation hearing was held on November 20 and November 22, 2006 at which the Debtor elicited evidence in support of its request for confirmation.[14]  Stephen Scherf, C.P.A. was called as an expert in forensic accounting and

---

[14]  A follow-up hearing was held on November 29, 2006 to resolve the remaining evidentiary issues pertaining to the confirmation record.

business valuation.  David Swayze, Esquire testified as an expert in Delaware and federal

consumer lending law and opined on the Subsidiary's compliance with those laws in

operating its payday lending business.   Finally Larry Frascella gave testimony about

Reorganized Frascella's contemplated business activities, particularly as related to the

Debtor's payday lending business.  At the conclusion of the hearing, the parties sought to

submit memoranda after review of the notes of testimony.  Their contemporaneous briefs

have now been filed, and this contested matter is ripe for resolution.


## DISCUSSION

### I.

To secure confirmation, a plan must comply with the requirements of § 1129(a).

The plan proponent bears the burden of establishing the satisfaction of each of the

confirmation requirements.  In re Lernout & Hauspie Speech Products, N.V., 301 B.R.

651,656 (Bankr. D. Del. 2003).   Indeed even absent objection, the bankruptcy court is

required to ensure that all the confirmation requirements are satisfied.  In re River Valley

Associates, 181 B.R. 795, 805 (E.D. Pa. 1995); In re Haskell Dawes, 199 B.R. 867, 872

(Bankr. E.D. Pa. 1996).  The Debtor has made an appropriate record, and there is no

challenge to its compliance with the various § 1129(a) criteria except as set forth in the

Consumers' Objection.[15]  I will thus turn to the issues they raise to examine whether the

---

[15]   Specifically I find that §§ 1129(a)(4), (5), (9), (10) and (12) are satisfied and
(continued...)

full panoply of § 1129(a) requirements have been satisfied to permit confirmation under § 1129(a).

## II.

## A. Section 1129(a)(1) and Classification

Objections (1) and (2) implicate § 1122 which requires a claim to be placed in a particular class only if such claim is substantially similar to the other claims in that class. 11 U.S.C. § 1122(a).[16]  As a plan may only be confirmed if it complies with all applicable provisions of the Bankruptcy Code, 11 U.S.C. § 1129(a)(1), improper classification is an impediment to confirmation.

The Debtor is obligated to certain investors (the "Noteholders") who hold seventeen promissory notes (the "Notes") in the aggregate amount of $2.27 million secured by guarantees delivered by the Frascella Brothers.  Exhibit D-3; Discl. St. ¶ 5.8.  Two of the Noteholders are the Frascella Brothers' mother Rosemary Frascella and stepmother Theresa Frascella.  Id.  As relatives of persons in control of the Debtor, Rosemary and Theresa are acknowledged to be insiders of the Debtor.  11 U.S.C. § 101(31).  Hearing Transcript November 20, 2006 (Tr. 11/20) at 164.  Their status is considered below.  However, none of the other Noteholders is a director, officer, control person, partner or insider of the Debtor.

_____

(...continued)
§§ 1129(a)(6) and (13) through (16) are not applicable to this Plan.

[16]  I note that the Memorandum of Law in Opposition to Confirmation of Debtor's Plan ("Consumer Memo") does not discuss this objection so I am making certain assumptions regarding the legal basis for the Consumers' contentions.

As of the Petition Date, interest payments under the Notes fixed at 30% were current, and the interest payments on the Notes have apparently been kept current post-petition. Id.[17] Confirmation of the Plan shall not discharge the Frascella Brothers' guarantee of payment to the Noteholders. Id. The Plan has classified the claims of the Noteholders as Allowed General Unsecured Claims designated as Class 3 and provides the same treatment as other unsecured claims so classified. The Plan also has classified the claims of affiliated entities of the Debtor, i.e., (i) Ambassador, (ii) JDL Services Corp. ("JDL"), (iii) Frascella Real Estate Investments ("Real Estate"), (iv) the Subsidiary, (v) Larry Frascella, and (vi) David Frascella (together with Rosemary and Theresa Frascella, the "Insiders") in Class 3.

The Consumers contend that the classification of the claims of the Noteholders and Insiders is improper. The Noteholders, they argue, made investments in the Debtor that should be characterized as equity not debt, and their claims should be separately classified and/or subordinated to general unsecured claims. The Insiders, they posit, should be subordinated due to their insider status. With regard to the Noteholders, a record was made to support the classification. Counsel to the Noteholders examined Scherf and led him

---

[17] The precise source of these payments has not been established. The Debtor's operating statement evidences post-petition payments to two of the Noteholders, Edward Meshel and Mark Tomasetti. See, e.g., Exhibit T-1. The Debtor's post-petition operating revenues were insufficient to cover all its expenses, and it received substantial intercompany transfers during the case. Id. Larry Frascella testified that payment of the notes would have been forthcoming from his other entities with a concomitant claim by that entity against the Debtor. Exhibit 4A at 20-21. The Subsidiary has claimed an administrative expense of $584,567 and Ambassador an administrative expense of $17,680. Exhibit D-2. To the extent that funds have been advanced by the Subsidiary and Ambassador to pay obligations to the Noteholders, I am hard pressed to understand how they could claim an administrative expense since post-petition payment by the Debtor of the interest on the unsecured notes would not be permitted. 11 U.S.C. § 502. While the Plan does not contemplate that the Debtor actually pay these amounts (the Subsidiary is waiving the claim; Ambassador will be paid by the Frascella Brothers), it is hard to understand why, if the interest payments are included in the administrative expense claim, they are recognized at all.

through the elements of the Note transactions that evidenced the indicia of debt and the

conclusion that the advances made by the Noteholders were in the form of loans and were

properly treated as debt.  However, it was Larry Frascella's testimony at the § 341 meeting,

not Scherf's managed testimony, that convinced me that the notes were intended as debt, not

equity. According to Larry Frascella, neither he nor his brother wished to give up any interest

in their companies to third parties.  Having the need for financing, they found it by providing

very high interest (30%) and low risk (personal guarantees).  Exhibit 4A at 18.  In the face

of this testimony and no contrary evidence, I have no basis to treat the debt as equity or to

subordinate it to other general unsecured claims.

Whether these favorable characteristics of the loans to the Noteholders require that

they be separately classified is another issue. Similar claims are generally placed in the

same class.  The similarity of claims is not judged by comparing creditor claims inter se.

Rather, the question is whether the claims in a class have the same or similar legal status

in relation to the assets of the debtor.  In re Piece Goods Shops Co., L.P., 188 B.R. 778,

788 (Bankr. M.D. N.C., 1995) (citing In re AOV Industries, Inc., 792 F.2d 1140, 1150 (D.C.

Cir. 1986)).  See also In re Lisanti Foods, Inc., 329 B.R. 491, 510-11 (D. N.J., 2005)

("'Substantially similar claims' are "those which share common priority status and

other legal rights against the debtor's assets."') (quoting In re Exec. Assoc., 161 B.R. 595,

600 (D. N.J. 1993) (citing In re Greystone Joint Venture, 995 F.2d 1274, 1278 (5th

Cir.1991))).  Unsecured claims, whether trade, tort, unsecured notes, or deficiency claims of

secured creditors, are generally included in a single class because they are "of equal rank

entitled to share pro rata in values remaining after payment of secured and priority claims."

FGH Realty Credit Corp. v. Newark Airport/Hotel Limited Partnership, 155 B.R. 93 (D. N.J.

1993) (*quoting* In re 266 Washington Assoc., 141 B.R. 275, 282 (Bankr. E.D.N.Y.1992)).

Because it is the nature of the claims being classified, as opposed to the nature of other

claims or interests the creditor may have, that is relevant, the existence of a third party

guarantee does not require separate classification.  The guarantee does not change the nature

of the claim *vis a vis* the debtor estate and thus does not impact a determination of whether

it is similar.  AOV, 792 F.2d at 196.  Nor then does the fact that the Noteholders are

apparently being preferred by the Frascella Brothers who are ensuring their payment

through other entities.  For classification purposes, the inclusion of the claims in Class 3

is permissible.[18]

The Consumers also contend that the claims of Insiders should be separately classified

and/or subordinated to the other holders of Class 3 claims.  In addition to the claims of

Rosemary ($10,000 note claim) and Theresa Frascella ($50,000 note claim and $249,240

lease rejection claim) and David and Larry Frascella ($230,749), there are pre-petition

unsecured claims asserted by Ambassador ($1,178,041), JDL ($6,869), Frascella Real

Estate ($6,000) and the Subsidiary ($651,018).  Exhibit D-2.  These claims total $2,381,917.

---

[18] As noted by the Third Circuit Court of Appeals in response to a classification challenge, "absent illegality or fraud, the Code is not concerned with a claim holder's reason for voting one way or the other, and undoubtedly most claim holders vote in accordance with their overall economic interests as they see them."  John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates, 987 F.2d 154,  (3d Cir. 1993).  While not grounds to overrule a classification scheme, the more favorable terms accorded the Noteholders by the Frsacella Brothers, i.e., guarantees and the payment of the 30% interest rate during the Chapter 11 case, are nonetheless relevant to my conclusion that the overwhelming support for the Plan is colored by the preferred treatment by the Frascella Brothers of all unsecured creditors other than the Consumers.  See infra p. 38-39.

While included for voting purposes, the affiliates and Frascella Brothers have agreed to waive receipt of a distribution from the estate.[19]

There is no per se requirement that unsecured insider claims be separately classified from other unsecured claims.  Insider status alone does not make a claim dissimilar. In re United Marine, Inc., 197 B.R. 942, 946 (Bankr. S.D. Fla. 1996) (citing cases).[20] The court explained that if Congress had intended to automatically disqualify insider votes from the class computation, it would have so provided as it did in § 1129(a)(10).[21] However, § 1126 does not do so but rather expressly states that the only votes that may be disregarded are votes of entities that are designated under § 1126(e).[22]  Compare In Re Holly Knoll Partnership, 167 B.R. 381 (Bankr. E.D. Pa. 1994).  A request for designation on notice and hearing has not occurred in this case.  Moreover, while the claims would properly be classified separately had they been subordinated, subordination cannot be accomplished through an objection to plan confirmation.  That remedy requires the commencement of an

---

[19]  Ambassador and JDL also assert administrative claims in the amount of $17,680 and $15,000 respectively which the Frascella Brothers have committed to pay.  The Subsidiary also has agreed to waive its administrative claim asserted in the amount of $584,000.

[20]  In United Marine, the debtor's parent company and an affiliated company held allowed unsecured claims which were classified with other non-insider unsecured claims.  As is the case here, the insiders had waived any right to distribution under the plan and were included to control the vote outcome.  Id. at n.2.

[21]  This section omits insider votes for the purpose of determining whether an impaired class has voted for the plan.  In this case, Class 2 (Republic Bank) fulfills that requirement.

[22]  Section 1126(e) provides:

On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

adversary proceeding which has not been pursued by the Consumers. Fed.R.Bankr.P. 7001(8).

The foregoing classification objections being the only challenge to the Plan's compliance with applicable bankruptcy law. I find § 1129(a)(1) has been satisfied.

## B.  Section 1129(a)(2) and Notice

The Consumers contend that the plan proponent has not complied with applicable law in that the Plan impermissibly seeks to discharge all claims against the Debtor without there having been notice of the disclosure statement and plan provided to past customers of the Debtor's payday lending business. In response, the Debtor simply states that there is no evidence in the record that notice was defective.[23] The Debtor had a much stronger answer to the notice claim which it did not assert, presumably because it would require an admission that it may eschew. First, to the extent the holder of a claim has not received appropriate notice, his claim will not be discharged. 11 U.S.C. § 523(a)(3). Moreover, if he receives notice of the bankruptcy so as to participate in the distribution, he can file a late claim averring excusable neglect. In re Jamesway Corp., 1997 WL 327105, at *10 (Bankr. S.D. N.Y. June 12, 1997). In any event, the Consumers' lack of notice is remedied if the Class Claim is allowed since its purpose is to allow the unidentified consumers to participate in the bankruptcy. But for the Debtor's argument that the payday borrowers have waived

---

[23] The court takes judicial notice of the Order approving the Disclosure Statement and establishing notice and voting procedures and the Certificate of Service transmitting same to conclude that the Consumers are correct. Doc. No. 166. A copy of the Disclosure Statement and Plan were not sent to past customers of the Debtor nor does the Debtor contend that they were. Perhaps the Debtor's cryptic response only means that it believes it had no duty to advise its former borrowers of the bankruptcy since it disputes that they have any claim.

that procedural remedy, the class proof of claim will accomplish the participatory function here.   Thus, I find no impediment to confirmation arising from the requirements of § 1129(a)(2).

### C.  Section 1129(a)(3) and Means Forbidden by Law and Good Faith

A more serious attack on the Plan is mounted with respect to § 1129(a)(3)'s mandate that the plan be proposed in good faith and not by any means forbidden by law.  The second prong of that criteria, i.e., "not by any means forbidden by law" provides the nexus to the Consumers' principal challenge to this reorganization.  They argue that Reorganized Frascella's contemplated business activity of payday lending over the telephone and internet to consumers in Pennsylvania violates state and federal consumer law.  The Debtor not surprisingly disagrees and produced an expert in the field of consumer lending to opine otherwise.  However, the need to consider these competing views requires me to address a threshold issue of interpretation of § 1129(a)(3) for the Debtor argues that while its proposed operations are not forbidden by any law, it need not establish that fact to win confirmation.  According to the Debtor, the plan proponent need not establish that the contents of the plan comply with all non-bankruptcy laws but rather that the proposal of the plan is not by any means forbidden by law.[24]   The Debtor cites case law that establishes that principle.  See In re General Development Corp., 135 B.R. 1002, 1007 (Bankr. S.D. Fla. 1991); In re Buttonwood Partners, Limited, 111 B.R. 57, 59-60 (Bankr. S.D.N.Y. 1990); In re Food City,

---

[24]  For example, if the plan proponent bribed others to take actions that would facilitate the confirmation, those criminal actions would be "forbidden by law" to preclude satisfaction of § 1129(a)(3).  7 Collier on Bankruptcy ¶ 1129.03[3][b], at 1129-39, 1129-40 (15th ed. 2004).

Inc., 110 B.R. 808, 811-812 (Bankr. W.D. Tex. 1990); In re Sovereign Group., 1984-21

LTD., 88 B.R. 325, 331 (Bankr. D. Col. 1988).

In response, the Consumers, without the benefit of any authority, argue that the

Debtor's interpretation is too narrow since it would allow confirmation of a plan which is

to be implemented by illegal means.  As one court noted responding to a similar claim,

their argument taken to its next logical step would "convert the bankruptcy judge into an

ombudsman without portfolio, gratuitously seeking out possible illegalities" in order to find

that the second prong of § 1129(a)(3) has been satisfied.  Food City, 110 B.R. at 812.  I agree

that there is no justification for assigning such a role to the bankruptcy court since discharge

does not insulate the reorganized debtor from subsequent enforcement actions for illegal

conduct.[25]  Having so concluded, I also note and concur with the following additional

observation by the Food City court:

> This is not to say that a potentially illegal provision is not a relevant
> consideration in the confirmation process.  For example, the legal
> consequences which might flow from the implementation of a substantive
> provision which is prohibited by law could affect the plan's feasibility under
> section 1129(a)(11)....Further, ... some illegalities might indeed undermine the
> *bona fides* of the plan's proposal, or be part of an illegal means of proposal.

110 B.R. at 812 n.10.  In this case, the Consumers have argued that Reorganized Frascella's

business plan is fatally flawed because, inter alia, it violates state and federal law.

An enforcement action which would enjoin the marketing and making of short-term loans

to Pennsylvania consumers, in their view, is inevitable, thus rendering Scherf's revenue

---

[25] Confirmation is not intended to provide a "'clean bill of health' with regard to all laws
with which a given plan might conceivably conflict." Id.

-17-

projections unrealistic.  I believe this argument implicates the feasibility of the Plan as does their further contentions that the income projections will never be realized because Reorganized Frascella will be in direct competition with Ambassador, another Frascella entity, and that the Frascella Brother's conduct in the past and during this case demonstrates a lack of will to fairly account to the Debtor and its non-insider creditors.  These points will be addressed in section F infra.

Section 1129(a)(3) also requires the plan to be proposed in good faith, and the Consumers argue that the Plan fails this test as well.  Specifically, they state that the "obvious and long-standing conflicts and the Frascellas' unwillingness to consolidate their companies or commit them jointly to the success of the reorganization plan, together with their repeated failure to make full and complete disclosure until forced by the trustee or Court to do so, reflect a pervasive absence of good faith that warrants denial of confirmation."  Consumer Memo at 22.

An extensive body of case law has developed to guide me in applying this criterion to this Chapter 11 reorganization.  The Third Circuit has identified the touchstone of the inquiry as "the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re PSW Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000). The purpose of the requirement is to prevent the debtor-in-possession from abrogating the creditor protections of Chapter 11.  In re Abbott's Diaries of Pennsylvania, Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986).  As explained by the Court in Genesis Health

-18-

Ventures Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001):

> Courts have found a plan to be proposed in good faith where the plan:
> (1) fosters a result consistent with the Code's objectives, [citations omitted];
> (2) the plan has been proposed with honesty and good intentions and with a
> basis for expecting that reorganization can be effected, [citations omitted] and
> (3) there was fundamental fairness in dealing with the creditors, [citation
> omitted].

Stated another way, "'[w]here the plan is proposed with the legitimate and honest

purpose to reorganize and has a reasonable hope of success, the good faith requirement of

1129(a)(3) is satisfied.'" Matter of T-H New Orleans Ltd. Partnership, 116 F.3d 790, 802

(5th Cir. 1997) (quoting In re Sun Country Dev. Inc., 764 F.2d 406, 408 (5th Cir. 1985)).

A debtor's plan may satisfy the good faith requirement even though the plan may not be

one which the creditors would themselves design and indeed may not be confirmable.

Matter of Briscoe Enterprises, Ltd., II, 994 F.2d 1160, 1167 (5th Cir.1993).  Bad faith, on

the other hand, has been found where there is no realistic possibility of reorganization and

the debtor seeks merely to frustrate efforts of secured creditors.  United Marine, 197 B.R.

at 947 (citing In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984)).

The Consumers aver that the Frascella Brothers' (1) failure to consolidate their related

payday lending entities or commit them jointly to the success of the plan and (2) repeated

failure to make full and complete disclosure until forced to do so by the Court or UST are

indicia of bad faith.  I will address each contention.  The Plan consolidates the Debtor with

the Subsidiary through the reverse merger.  A further consolidation with Ambassador would

cure many of the concerns I address below.  However, the refusal to do so cannot be found

to evidence bad faith but a business decision to keep the operations of Ambassador separate and apart from Reorganized Frascella.  The Plan as proposed is consistent with the legitimate objectives of Chapter 11 to accomplish a reorganization. The alternative for the Debtor would have been a liquidation.

The flaw of Debtor's reorganization resides in the alternative argument that there has not been a full and complete disclosure, important facts being revealed at the confirmation hearing and relevant information not being revealed at all.  As I noted at the hearing in ruling on a relevancy objection, I would not measure the Debtor's good faith by the pre-bankruptcy conduct of its principals who admittedly treated the Debtor and themselves as one and the same.  The Debtor was given an opportunity to reorganize and propose a plan that would treat its creditors equitably.  Regrettably while the Debtor hired new counsel and a forensic accountant to build credibility, the Frascella Brothers' conduct during this case, as was revealed during the confirmation hearing, suggests that they did not seize this opportunity and that the Plan has not been proposed in good faith.  Two examples illustrate this point.

The Longview Note.  With the intended business of the reorganized company in the Subsidiary during the pendency of this proceeding, the payday lending operations have been beyond the oversight of this Court.  During the course of the confirmation hearing a significant transaction that will affect the post-reorganized company, was uncovered which supports my conclusion that the Frascella Brothers cannot be relied upon to deliver the committed distribution to creditors for the next six years.  In an attempt to demonstrate that creditors will receive under the Plan more than they would in a liquidation under Chapter 7, Scherf prepared a liquidation analysis.  Exhibit D-10.  This analysis was described as an

update of the liquidation analysis set forth in the September 22, 2006 Disclosure Statement.

See infra § D[26]  Notably, the update pertained to a transaction that significantly predated the

disclosure statement but to which Scherf had presumably not been advised.  The newly

revealed fact was that the Subsidiary, along with Ambassador, JDL[27] and another Frascella

entity known as NPC Investments[28] as co-obligors, had secured a line of credit of up to

$10 million[29] pursuant to a note from the Longview Equity Fund (the "Longview Note")

to provide funds for payday loans to be made by the Subsidiary as well as Ambassador.

To secure the obligations under the Longview Note, Ambassador and the Subsidiary pledged

all their assets to secure the full amount of the Note.  Thus, on the first day of confirmation,

it was disclosed for the first time that the Debtor was merging with a company that had six

---

[26] Specifically the point was that the Subsidiary stock which is wholly owned by the Debtor has no value in a liquidation because its now stated and lowered value of [$100,000] would be captured by the assets pledged to secure a $10 million note.  The Disclosure Statement had originally attributed a $770,000 value to the Debtor's equity interest in the Subsidiary which would generate $539,000 in a Chapter 7 liquidation.  Disc.St. Schedule 4.1.

[27] JDL is another Frascella Brothers' entity, which according to the Disclosure Statement provides "technology and marketing services to short-term lenders and loan brokers," including Ambassador.  Discl. St. at 14.  Whether its services were provided to any entity unaffiliated with the Frascella Brothers is unknown.  The Debtor denies that this company, located in Pennsylvania, provided service to the Debtor.  However, at the inception of the case, the Debtor's CFO was identified as Chance Minor, an employee of JDL (not the Debtor).  This statement made under oath appears to have been refuted.  JDL also paid the compensation of the Frascella Brothers.  It is not clear why it is a co-obligor under the Longview Note.  Moreover, as inadvertently learned at the confirmation hearing, JDL's functions appear to have been transferred to a new entity and it is in the process of being dissolved.  See infra p. 23-24.

[28] Identified only as a Delaware limited liability company, its inclusion in this lending group is not explained.  Nor is it clear why JDL is an obligor given its role as a servicer, not lender.

[29] This amount could increase to $20 million if certain conditions are met.

-21-

<u>months earlier encumbered all of its assets to secure its own as well as the obligations of the</u>

<u>related Ambassador</u>.  Notably creditors that voted in favor of the Plan had not been informed

about this transaction or its implications for Reorganized Frascella's future performance.

While Scherf had no information regarding the particulars of the Longview

transaction, my inquiries of him apparently concerned the Debtor and its counsel sufficiently

to attempt some rehabilitative measures between the first and second day of the confirmation

hearing.  At the continued hearing, Larry Frascella was able to report that the outstanding

balance on the Longview Note is $4.1 million, $602,044 attributable to the Subsidiary

and the balance to Ambassador.  Exhibit D-34.  Under the terms of the Loan and Security

Agreement, the lender shall make advances up to 85% of the aggregate principal amount of

outstanding loans made by both Ambassador and the Subsidiary not to exceed $750,000 per

month (subject to increase to $1 million).  Exhibit D-31.[30]  The assets of both borrowers

secure the loan balance without regard to each borrower's actual draws on the loan.

Exhibits D-30, 31 and 33.  Larry and David Frascella have guaranteed payment of the

Longview Note.  Exhibit D-32.

Presumably feeling some vulnerability from this heretofore undisclosed legal burden,

an agreement was concluded with Longview as the second day of confirmation testimony

commenced that requires Longview, provided the Plan is confirmed, to exhaust its remedies

against the defaulting borrower (if not the Subsidiary) before moving against the assets of

---

[30]  Contrary to the hearing testimony, advances are not determined as a percentage of each company's loan receivables but as a percentage of the aggregate loan receivables.  Under this formula, Ambassador and Reorganized Frascella could be in competition for available funds. To whom the borrowing is directed will be at the discretion of their common owners, the Frascella Brothers.

the Subsidiary.  Exhibit D-35.[31]  According to Larry Frascella, both the Subsidiary and

Ambassador are current on their obligations to Longview under the Longview Note.[32]

Clean Breeze.  While on the surface Clean Breeze Technologies ("Clean Breeze")

appears to be an insignificant footnote in the Frascella organization, it takes on larger

dimensions because of the refusal of Larry Frascella to come clean on its significance.

As noted above, during the course of the hearings, it was disclosed that JDL, which provides

marketing and servicing services for Ambassador, was in the process of being dissolved.

Larry Frascella explained that the Frascella Brothers no longer desire a servicing company

in Pennsylvania.[33]  JDL carried on its payroll the Frascella Brothers and Dennis Williams.[34]

Tr. 11/22 at 83.  JDL also employed Change Minor who signed the Chapter 11 petition

and schedules appeared at the Debtor's original § 341 meeting and in court testimony as the

Debtor's CFO.  That relationship was subsequently disavowed by Larry Frascella when he

testified at the rescheduled § 341 hearing.  When questioned as to Minor's current

relationship with the Frascella organization, Larry Frascella replied that he "believed he was

---

[31]  The new agreement only inures to the benefit of the Subsidiary which if it defaults, will expose both its assets and the assets of Ambassador without any exhaustion.  Longview was requested but refused to remove the cross collateralization provision.  Notwithstanding that refusal, Larry Frascella opined that Longview would be paid in full upon a default and liquidation of Ambassador.  However, with an asset to loan ratio of 1.19, that conclusion is not assured. Exhibit D-34.

[32]  The termination of JDL also appears to be a default under the Longview documents but according to Larry Frascella, not one that has any consequences since Longview is aware of his plans to wind up JDL.  Tr. 11/22 at 146.

[33]  Until the June 2006 move to Delaware, JDL was located in Langhorne, Pennsylvania at the same address as Larry Frascella and Dennis Williams, in house counsel for all the Frascella companies.  Tr. 11/22 at 73- 77.

[34]  Since it was apparently moved to Delaware in June 2006 to serve Ambassador, I am not clear why it must be dissolved and is being replaced by Principal, another Frascella entity.

employed by Clean Breeze" and that he had no title with the Debtor, the Subsidiary or JDL. Tr. 11/22 at 137. According to Larry Frascella, each one of the Frascella entities pays money to Clean Breeze who in turn pays workers, including Minor, Williams and "a number of the people ... who run the functions of Frascella Enterprises of Delaware" [i.e., the Subsidiary] and "Principal Technologies." Id. at 85. As best as I can understand from Larry Frascella's reticent testimony regarding the complicated and changing structure of the Frascella Brothers' organization, Ambassador, the New Mexico company, is now serviced by another Frascella company, Principal Technologies Systems ("Principal"), located at the Subsidiary's Delaware offices and performing the same services that had been performed in Pennsylvania by JDL. Id. at 90. While Principal pays the compensation of the Frascella Brothers and certain other management, Clean Breeze pays all other salaries for work done for Ambassador and the Subsidiary. Id. at 92.

On questioning by the Court, Larry Frascella stated that Clean Breeze is an employee leasing company located in Pennsylvania and not owned by himself or his brother. When further pressed by the Court, Larry Frascella disavowed any knowledge of Clean Breeze's owner or its location in Pennsylvania. Tr. 11/22 at 84, 92. In short, all the non-management employees responsible for the operation of the reorganized company, the general in-house counsel for all the Frascella companies, including the Subsidiary, and the mysterious Chance Minor are being "leased" from a company whose location and ownership are unknown to Larry Frascella.[35] The ambiguity concerning Clean Breeze,

---

[35] Larry Frascella's lack of knowledge of the actual ownership or the city or town where he makes payments of his most significant operating expense for all his companies, while seemingly

(continued...)

its ownership and management, and its employment of all non-management personnel for both the Subsidiary and Ambassador further undermines my confidence in Reorganized Frascella as an independent viable corporation.

It is hard to conclude that a plan has been proposed in good faith where relevant disclosures have not been made, suggesting a manipulation of the financial information to present a plan which meets the best interests of creditors test. See infra § D. It is hard to find that a plan has been proposed in good faith when the integrity of their three entities are loosely observed by the Frascella Brothers who historically and presently draw upon the resources of each to satisfy claims of the other. While that practice may not trouble other unsecured creditors, who, unlike the Consumers, have been granted guarantees of payment by the Frascella Brothers, it is a significant obstacle to a finding of good faith insofar as good faith requires. The fundamental fairness of this Plan must be questioned; the honesty of its commitments are unproven. However, rather than rely solely on the subjective and amorphous rubric of good faith to deny confirmation, I find that many of the facts that negate a finding of good faith ultimately render the Plan infeasible, as I will explain in detail in Section F.

### D. Section 1129(a)(7) and the Best Interests Test

Section 1129(a)(7) requires that claimants in each class either have accepted the plan or they will receive or retain property under the Plan of a value that is not less than what

---

(...continued)

incredible, may be true but given his unsolicited emphasis on the Frascella Brothers' non-ownership of Clean Breeze, suggests an intention to shield himself from this information.

they would receive in a Chapter 7 liquidation proceeding.  11 U.S.C. § 1129(a)(7).  The latter

alternative is commonly referred to as the "best interests of creditors test."

The Debtor contends that each class has accepted the Plan but should I disagree after

estimating the Consumers' claim, I will find that the Plan is in the best interests of creditors.

Given the difficult task of estimating the Consumers' claim, I will first address the best

interests test since if the Debtor has proven that creditors will receive at least what they

would receive in a liquidation proceeding, it will obviate the estimation of the claim to

determine satisfaction with this confirmation requirement.

The Debtor's claim that creditors would receive more under the Plan than in a

liquidation was advanced by Scherf who testified to a liquidation analysis that showed

that only $209,645 would be available for unsecured creditors in a Chapter 7 liquidation.

Exhibit D-10.  As this is less than the $1,050,000 total distribution to unsecured creditors

proposed under the Plan,[36] Scherf testified that the Plan was a much better option for

creditors. Tr. 11/20 at 101-02.  In so concluding, Scherf apparently accepted without further

inquiry certain representations about the financial condition of the Subsidiary and ignored

certain claims that a Chapter 7 trustee would have that could bring value to the estate.

First, and as discussed in some detail above, is the matter of the value of the Debtor's

interest in the Subsidiary.  Originally disclosed as $770,000, Discl. St. at Schedule 4.1,

the value was reduced to zero at the confirmation hearing.  Scherf testified that this

---

[36]    Notably Scherf did not take into consideration the deferred payout feature of the
distribution and discount the $1,050,000 for present value.  While the Disclosure Statement states
that creditors are advantaged under the Plan in that a Chapter 7 liquidation takes time, that statement
needs to be qualified here where the distribution is protracted over six years.  Discl St. ¶2, at 4.
This is the least of the flaws in the liquidation analysis.

amendment was occasioned when he was told that the Subsidiary had pledged all its assets to secure the $10 million Longview Note. Notably he had not examined the documents and did not know the terms of the borrowing or the identity of the other borrowers. Rather he appears to have accepted the Debtor's position that there simply would be no value for equity if the Subsidiary were liquidated. Subsequently at the confirmation hearing the Debtor revealed the details of the lending transaction but Scherf was never asked whether that affected his liquidation analysis. Moreover, it is not clear whether Scherf ever examined a current financial statement of the Subsidiary. Certainly none was produced for this record. Indeed the balance sheet he relied upon for his report dated April 30, 2006 shows total equity of $2,955,044.[37] Exhibit D-1. How can a company that is supposed to generate $200,000 excess profits annually to support this Plan have no value? In short, these questions might have been put to rest by the presentation of a current financial statement for the Subsidiary. The decision not to provide one, given the business practices of the Frascella Brothers and the failure to disclose the secured borrowing to the forensic accountant, supports an inference that the Debtor's position that there is no value in the Subsidiary could not be proven.

Another potential asset that is ignored is the loan portfolio which was transferred by the Debtor to an affiliated company within one year of the petition date for no consideration.

---

[37] The assets include $513,342 due from Ambassador, $924,085 from "FE [Frascella Enterprises?]," $710,885 due from JDL and $548,458 loans receivable. Notably the liabilities as of April 30, 2006 do not reflect any borrowing notwithstanding the Longview transaction Scherf belatedly learned of having occurred on April 6, 2006. Since Scherf was satisfied to write off any equity in the Subsidiary due to the $10 million potential obligation it incurred under the Longview Note without regard to its actual draw on that loan, I can only conclude that no one told him about the transaction or let him discover the papers when he did his forensic examination.

See supra n. 10.  Because of the implications for the Consumer Action, I make no findings as to what transpired nor could I in light of the Debtor's conflicting explanations and the failure of the forensic accountant to focus on this transaction.  Thus, which entity secured the benefit of the transfer is not known.  Presumably the portfolio is now held by the Subsidiary and the value would be reflected on its balance sheet if one were produced.  If that is the case, there may be no benefit to seeking to avoid the transfer since the Subsidiary and the Debtor are intended to merge.  If, however, the transfer was made to Ambassador which reaped benefits for which it paid no consideration to the Debtor, the Debtor may have claims against that entity.  Whether they are greater or less than Ambassador's claims against the Debtor is simply unknown.

The other soft number in the liquidation analysis is the amount of administrative claims.  There was a significant escalation in the amount of professional fees from the filing of the Amended Disclosure Statement ($300,000 estimated) to the preparation of the Amended Liquidation Analysis ($552,000), two months later.  The increase has neither been explained nor has the estimation been supported with unpaid fee orders and accrued time records.  That is not to say that fees of this magnitude would not be possible in a case where confirmation is contested and there is a significant piece of litigation pending.[38]

---

[38] I note that with the appearance of counsel for the Frascella Brothers in the Class Action, the personal attorneys have been taking the lead in that matter.  While the Plan reserves $50,000 (of the $100,000 to be contributed by the Frascella Brothers) for future counsel fees for litigation in which they are also defendants, it is not clear how those fees (which are not subject to court approval) are being allocated among the defendants.  Moreover the Debtor contributes an additional $200,000 for future costs of the Class Action, the benefit of which plainly inures to the Frascella

(continued...)

-28-

What it does say is that the Chapter 11 administrative expense claims as well as the Chapter 7 costs are simply unsupported. Where did the estimates come from? On what are they based? Scherf's testimony did not give me a clue. Since the aggregate administrative expense claims of $860,425 offset 63% of the liquidation value of the assets, answers to these questions are necessary to establish that part of the equation.

The Debtor's Chapter 7 analysis as solely presented by Scherf is deficient in other respects. Aside from the transfer of the loan portfolio for which the Debtor received no value, the payment to the unsecured Noteholders before and after the case was commenced suggests potential avoidance actions by a Chapter 7 trustee. At the § 341 meeting Larry Frascella testified that prior to the petition being filed, three of the investors were paid $1-1/2 million. Exhibit C-4A at 22-23.[39] He explained that in anticipation of an increase in lending activity in the last quarter of the year and having a cash shortfall, he borrowed the money with a commitment to pay it back quickly so the lenders would be repaid by year end. Id. When queried by the UST as to why the Debtor, which had ceased payday lending operations, needed funds, he was stumped and could only conclude that even though the notes were provided by the Debtor, there was no difference between it and the Subsidiary which presumably did need the money. Thus, while the payday lending emanated from the Subsidiary, the obligation was incurred by the Debtor. Id. at 25. Larry Frascella also testified that it was the Frascella Brothers' practice to borrow the money and then channel

---

(...continued)
Brothers and not creditors. A Chapter 7 trustee would most likely seek to negotiate a more equitable sharing arrangement.

[39] He identified Alabed, Levine and DiAngelis as the transferees.

it to the entity that needed it.  Id. at 67-68.  The foregoing suggests that the Notes memorializing the claims against the Debtor as borrower may not match the recipient of the funds.  Scherf who had the benefit of the § 341 testimony before performing his forensic analysis neither mentioned this in his Report nor took it into account in his liquidation analysis.

Since it is the burden of the plan proponent to prove that creditors would receive more under the plan than they would in a liquidation, I cannot find that the second alternative of § 1129(a)(7) has been satisfied on this vague record.  However, as noted above, that deficiency is not fatal if every impaired class has accepted the Plan.  This takes us full circle to the Estimation Motion which I will consider in Part II.

### E.  Section 1129(a)(8) and Class Acceptance

Section 1129(a)(8) provides that the Plan must be accepted by each impaired class of claims and interests. 11 U.S.C. § 1129(a)(8).  However, notwithstanding this requirement, a plan may be confirmed over the rejecting vote of a class of impaired claims if the plan does not discriminate and is fair and equitable with respect to such impaired class.  11 U.S.C. § 1129(b).  Thus the failure to comply with § 1129(a)(8) is not fatal.  Rather it requires an analysis of the Plan under the cram down provisions of § 1129(b).

The Debtor contends that it has secured the requisite votes in number and amount of each class of claim and interest entitled to vote on the Plan.  Its Report of Plan Voting supports that position but only because it has not considered the rejecting $7.65 million ballot of the Consumers.  As noted, the Consumers have sought to have their disputed claim

temporarily allowed for voting purposes pursuant to Fed.R.Bankr. 3018(a).  The Debtor advises me that if that claim is allowed for at least $2,245,000, Class 3 will have rejected the Plan, and it will seek confirmation under § 1129(b).  Tr. 11/20 at 6.

A class of claims has accepted the plan if creditors that hold two-thirds in amount and more than one-half in number of the allowed claims vote to accept the plan. 11 U.S.C. §1126(c). Based on this statutory formula and the existing allowed claims, the Debtor presumably determined that $2,245,000 is the magic number as to amount.  In other words, if the Consumer POC which has been voted against the Plan exceeds that amount, Class 3 will have rejected the Plan.  While the Consumers did not dispute this number or advance one of their own, their objection to the classification of the Noteholder and Insider claims in Class 3 suggests no agreement on this subject.  Notably the parties did not address the number requirement. I don't know whether that is indicative of a mutual assumption that the class claim counts as one so that only the amount requirement is a relevant issue.[40]

However, whether confirmation is sought pursuant to § 1129(a) or (b), all § 1129(a) requirements other than § 1129(a)(8) must be established without regard to the otherwise acceptance of the Plan by the voting classes.  If the Plan cannot be confirmed under § 1129(a), there is no point, at least at this juncture and for this purpose, of estimating

---

[40] Assuming class certification were to occur, there is support (albeit without addressing the question head on) for counting the Consumers' class claim as one vote.  See, e.g., Trebol Motors Distributor Corp. v. Bonilla (In re Trebol Motors Distributor Corp.), 220 B.R. 500, 502 (1st Cir. BAP 1998) ("since the class is the holder of the claim, it follows that a single proof of claim will suffice.")  Unlike the facts of In re Mortgage & Realty Trust, 125 B.R. 575 (C.D. Cal. 1991), none of the Consumers have filed individual claims (including the three class plaintiffs whose claims are part of this record and who presumably would have an opportunity to file a late claim individually if class certification is denied), and thus whether individual claims would also be counted need not be addressed.

the Consumer claim.  Since I find that the Plan cannot be confirmed under § 1129(a),

it follows that it cannot be confirmed under § 1129(b).

### F.  Section 1129(a)(11) and Feasibility

Section 1129 (a)(11) requires the court to find that

> [c]onfirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of
> the debtor . . . unless such liquidation or reorganization is
> proposed in the plan.  11 U.S.C. § 1129(a)(11).

The purpose behind the statutory requirement of feasibility is to "prevent confirmation of

visionary schemes which promise creditor and equity security holders more under a

proposed plan than the debtor can possibly attain after confirmation."   7 Collier on

Bankruptcy, ¶ 1129.03 [11], at 1129-74.1 (15th Ed. Rev. Sept. 2005).  Accord Matter of

Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985); In re Cohen & Sons Caterers,

Inc., 124 B.R. 642, 647 (E.D. Pa. 1991).   However, feasibility does not require that

substantial consummation of the plan be guaranteed; rather, the plan proponent must

demonstrate that there is a reasonable assurance of compliance with plan terms.  See Kane v.

Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Monnier Bros., 755 F.2d

1336,1341 (8th Cir. 1985); In re Cohen, supra; In re Orlando Investors, L.P., 103 B.R. 593,

600 (Bankr. E.D. Pa. 1989).

"In order to evaluate the likelihood of successful confirmation of the proposed plan,

courts generally consider factors such as capital structure, potential earnings, market

conditions, and management capabilities." Orlando Investors, 105 B.R. at 600.  Accord In re

Prussia Associates, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005).  As noted above, only

$50,000 of the Class 3 distribution will be paid on the Effective Date while the remaining

$1,000,000 will be paid commencing in twelve months, annually for five years from

operating revenues of the reorganized company.  Accordingly the potential earnings of

Reorganized Frascella are determinative of the Plan's feasibility.

    Projections.  According to Scherf, the Debtor's forensic accountant and business

valuation expert, Reorganized Frascella will be able to fund the Plan.  In support of his

conclusion, he offered a projected statement of revenues and expenses to show that there will

be sufficient cash flow to make the annual creditor payments.  Exhibit D-11.  It assumes a

20% growth in revenues which Scherf "compared [] to historical operations based on

representations of the [D]ebtor." Tr. 11/20 at 104-05.  Scherf further stated that since he was

not sure about the growth scenario, he also verified that the Plan could even be funded with

no-growth.  However, while Scherf initially gave assurances that the no-growth scenario

will assure funds to pay the first $200,000 distribution in twelve months, upon cross

examination by the UST, he acknowledged that with no growth from 2006 to 2007,

Reorganized Frascella would be $40,000 to $50,000 short of the necessary funds to make

the first payment.  Id. at 142-43.

    Like Scherf, I am not sanguine about the growth scenario.  Aside from its identified

source being representations by the Frascella Brothers whose testimony in this court,

this confirmation hearing not excluded, has been at best conclusory and vague and at times

misleading, Scherf offers no support for his conclusion.[41]  Indeed I do not know how he

could evaluate that growth projection against the Debtor's history since the Debtor has not

operated as a lender since 2005 and the lending operations contemplated by Reorganized

Frascella are solely internet/telephone based without the benefit of the store front operations

the Debtor employed and are targeted only to customers in Pennsylvania and Delaware.

Whose history and experience are these projections based on:  the Debtor, the Subsidiary,

or perhaps Ambassador, another payday lending business operated by the Frascella Brothers

in other states?  Moreover, as elicited by the UST, the impact of Ambassador on the future

viability of Reorganized Frascella has simply been ignored.

---

[41]  On direct testimony, Larry Frascella simply concluded without explanation that the reorganized company would be able to generate the forecasted revenues and be able to make future plan payments of $200,000 for the next five years.  Tr. 11/20 at 54.  On cross examination, that conclusion was tested insofar as the assumption that there would be a 20% growth in revenues starting after the first year.  His explanation follows:

> Q:  Okay.  What is the basis for your projecting a 20 percent increase in business each of those years?
> A:  Just basically a concentration on, you know, on the business.  And hopefully we can get passed [*sic*] confirmation by then and just, you know, move forward and, you know, concentrate on growing the business.
> Q:  Well, were there – other than just coming up with a figure of approximately 20 percent, did you have some worksheets or did you do some analysis or did you do some planning with respect to how you're going to grow the business?  Any of that –
> A:  Primarily –
> Q:  – kind of activity take place?
> A:  Primarily, Mr. Adams, based on experience, we've grown portfolios before, Ambassador being one, and obviously, you know, we've been in the payday loan business a long time.  So, we know how to advertise.  We think we know how to get it done.

Not produced were any past operating statements of the Subsidiary that has been engaged in the payday lending business since December 2005 or the Debtor before that to evidence actual historical growth.

Competition with Ambassador.  Ambassador, a Wyoming corporation domiciled in New Mexico, was formed in January 2003 and although it has one storefront office in New Mexico, offers loans only by internet, mail or phone.  Discl. St. § 5.4.  Essentially offering the same product as the Subsidiary, Ambassador has the ability to capture future business from Reorganized Frascella at the whim of the Frascella Brothers who control both entities.  When questioned about the potential of Ambassador competing for the same business as the Subsidiary, Larry Frascella could only respond that the sole reason that Ambassador would not be making loans to Pennsylvania customers is that it has decided not to do so.  Tr. 11/22 at 156-59.[42]  Thus even if there is potential payday lending business to support the growth projections, there is no assurance that the new loans will be directed to the Subsidiary as opposed to Ambassador.  On the contrary, the *modus operandi* of the Frascella Brothers is to conduct their business without regard to the separate identities of the maze of related companies they have formed and continue to form for their own purposes, not always apparent or disclosed.  Given Larry Frascella's testimony that was marked for its lack of a formulated plan regarding the separate marketing, advertising and operations of Reorganized Frascella and Ambassador, Tr. 11/22 at 151-59, it is hard to accept Scherf's projections that are based on the Frascella Brothers' representations.  Thus, while the court agrees with the Debtor that to be feasible the Plan need not guarantee success but only

---

[42]  With that admission, the UST abandoned further attempts to elicit from Larry Frascella an understandable explanation of his multi-state lending operations.  As circular and confusing as that testimony was, it is significant that Larry Frascella was unable to identify any restriction on Ambassador (or yet a further new entity that may be created organized as a lender or servicer) from competing with the Subsidiary for new Pennsylvania business so that the future viability of the reorganized company is protected.  Id. at 157.  Thus creditors are left to rely on the integrity and good faith of the Frascella Brothers which, as noted above, is the fatal flaw to this Plan.

provide a reasonable prospect of success, Debtor's Memorandum in Support of Plan at 38-39, the uncertainty of the revenue projections is exacerbated by the lack of a clear business plan for Reorganized Frascella as well as other factors which Scherf did not consider, the most significant one being the fluid manner in which the Frascella Brothers operate their businesses. The inability of Larry Frascella to coherently and credibly explain the structure of his lending operations (e.g., the Clean Breeze leasing model) along with his failure to explain how Reorganized Frascella will be able to increase the revenue stream of the Subsidiary from Delaware and Pennsylvania consumers to generate $200,000 of additional profits to make distributions under the Plan preclude me from finding that the Plan is feasible even before considering the issues raised by the Consumers concerning the potential for regulatory impairment of the business.

Regulatory issues. I accept the expert testimony of David Swayze, Esquire that the single state operating model proposed for Reorganized Frascella does not violate Pennsylvania banking law provided that there are no business activities in the Commonwealth, and none appear to be contemplated.[43] Whether the Subsidiary has any independent liability for the period from County Bank's lending termination date of May 1, 2005 to the Subsidiary's Delaware licensure date of December 27 for loan renewals made is presently unknown. Given the Debtor's past and present explanations of the status of the loan portfolio during this period, exposure cannot be discounted. Unlike the Debtor's

---

[43] The Consumers also argue that the business model violates general Pennsylvania usury law (i.e., Act 6), and as such is illegal in Pennsylvania. I need not reach that issue, having found that the legal risks acknowledged by the Debtor and the potential claims brought by the Subsidiary are sufficient to require recognition in the projections but have been ignored.

liabilities, those of the Subsidiary will not be discharged and will have to be satisfied by Reorganized Frascella.  No reserve has been established for such a contingency.[44]

The foregoing is in addition to the inherent risks of the short term lending business which are identified in the Debtor's Disclosure Statement.  Discl. St. § 11.2.  As the Debtor notes, "the legal and legislative landscape for this industry is constantly changing. Any negative change in the state of the current legislation may have a devastating impact on the continued operations and the value of the Subsidiary. . . . The enforceability of interstate consumer loans made by nonbank lenders is legally uncertain."  Id. at 39.  In response to questions about who would get new non-Pennsylvania and Delaware business, Reorganized Frascella or Ambassador, Larry Frascella noted that he will take a "wait and see approach" in "reaction to state attorney general complaints."  He concluded that "if the model that we believe in does not win – if we're not right, then we will get licensed in every state." Tr. 11/22 at 152.  He did not specify whether that step would be taken by Reorganized Frascella or Ambassador or another new entity but in any event, that possibility (and its attendant cost) does not appear to have been accounted for in the six year projections. Indeed no reserve has been established for any of the risks occasioned by the nature of the regulatory climate generally or the manner in which the Subsidiary operated prior to its licensure.  Given the fact that the annual $200,000 Class 3 payout is not started for one year nor concluded for five more, the risk of the uncertain legal foundation of the business is borne disproportionately by unsecured creditors.

---

[44]  The Disclosure Statement indicates that the Consumers, which have not named the Subsidiary in the Class Action, have threatened suit against the Subsidiary as well which will mean additional legal fees and costs beyond those estimated in the Disclosure Statement.  Id.

In expressing this concern about the potential realization of the proposed distribution to unsecured creditors, I am mindful that other than the Consumers, Class 3 has voted to accept the Plan. One might conclude from that fact that there is creditor support for the Plan which I should and would ordinarily respect. The flaw in that reasoning is two-fold: (1) votes were cast without full disclosure of material facts as outlined above and (2) every one of the supportive creditors have guarantees of payment from the Frascella Brothers. This includes the Noteholders ($2,270,000) who have disingenuously claimed that the "Plan is their only avenue to obtain any meaningful recovery on their loans from the Debtor." Brief in Support of Confirmation at 3. It also includes: Richmond ($300,000) which settled its fraudulent transfer claim by securing payment from the Frascella Brothers; Shore Auto Brokers ($200,000) whose claim is guaranteed for unknown reasons; and assorted affiliates and insiders, including Ambassador, the Subsidiary, the Frascella Brothers, Frascella Real Estate, Teresa Frascella and JDL, representing the balance of the $4,891,917 which voted in favor of the Plan. Report of Plan Voting (Doc. No. 192); Exhibits D-3, D-21 and D-36. Against this record is the uncounted, yet to be estimated negative vote of the Consumers. ($7,650,000).[45]

## III.

### A. Appropriateness of Estimation

As noted above, a hearing on the Estimation Motion preceded the confirmation hearing. In the interests of the economic administration of this case, the parties agreed to

---

[45] There is also an uncounted accepting vote of Morrisville Plaza Associates to whom no distribution is being made in Class 3 but who perhaps is being paid as an administrative expense.

proceed with the confirmation hearing while the Estimation Motion was briefed and decided. As a preliminary matter at the estimation hearing, I agreed with the Consumers' contention that estimation was necessary to allow them to participate in the plan confirmation process since the Debtor had not counted their vote. I rejected the Debtor's arguments that estimation did not advance any of the policies for which it is intended concluding that the liquidation of the $7.6 million claim could delay the administration of the case to the extent it impacted on confirmation. The Debtor's argument to the contrary on the grounds that the claim is unenforceable, put the cart before the horse.

Section 1126(a) states that the holder of an allowed claim may accept or reject a plan. Section 502(a) states that a claim is deemed allowed unless a party in interest objects. Thus, if the debtor has filed an objection to the claim, the creditor may be effectively disenfranchised if the claim objection is not adjudicated before confirmation. To prevent possible abuse by plan proponents who might seek to gain acceptance of the plan by filing last minute objections to claims of adverse creditors, temporary allowance of the claims for voting purposes is prescribed by Federal Rule of Bankruptcy 3018(a).[46] Armstrong v. Rushton (In re Armstrong), 294 B.R. 344, 354 (BAP 10th Cir. 2003). It provides in relevant part that:

> Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan.

Fed.R.Bankr.P. 3108(a).

---

[46] Section 502(c) provides for estimation to fix a claim which is contingent in nature so that its liquidation would unduly delay the administration of the case. However, estimation under § 502(c) determines distribution as well as voting rights.

I agree with the Debtor, nor do the Consumers contend otherwise, that the objection to the Consumer's claim was not filed for improper strategic reasons. However, that is not a necessary predicate for estimation. The policy underpinnings of estimation are also served where, as here, the claim could not be adjudicated before the confirmation hearing as a result of the parties' agreement to take discovery and seek a ruling on the Arbitration Motion. For the same reason I did not find that the Rule 3018(a) motion was untimely.[47]

Estimation is at best an imprecise and uncharted process. The Bankruptcy Code and Rules provide no guidance on how to proceed. The determination of whether and how to determine the temporary allowance of a claim is left to the sound discretion of the bankruptcy judge. Armstrong, supra; In re FRG Limited Partnership, 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990) (citing Bitner v. Borne Chemical Company, 691 F.2d 134 (3d Cir.

---

[47] The Debtor had argued that the Estimation Motion was untimely because it was not filed before the voting bar date. There is support for that position. In Jacksonville Airport, Inc. v. Michkeldel, Inc., 434 F.3d 729, 730 (4th Cir. 2006), the bankruptcy court's denial of an oral motion to temporarily allow an objected to claim made at the confirmation hearing was affirmed. Contrary to the Consumers, the claimant in Jacksonville had not filed a Rule 3018(a) motion. Notably there is no rule requiring when a Rule 3018(a) motion must be filed. Accordingly, I exercised my discretion to go forward with the estimation on the facts of this case in that the motion had been filed and answered and the reason for the filing delay constituted special circumstances. Specifically, the parties had agreed to suspend any consideration of the Debtor's objection to the Consumer's proof of claim until I ruled on the Debtor's pending arbitration demand. Adv. 06-101, Doc. No. 37 (Stipulation). Cf. In re Epic Associates, 62 B.R. 918, 923 (Bankr. E.D. Va. 1986) (finding judicial discretion to allow change in ballot even where a bar date was fixed). I am not sure what, if anything, the parties contemplated regarding plan voting; it may be that both sides waited to see what the other would do. However, once the Debtor took the position that the Consumer's claim could not be counted, the Estimation Motion was filed. To preclude consideration of the Estimation Motion would foreclose the Consumers from attempting to make a record to support their franchise if necessary to the outcome of the request for confirmation.

-40-

1982)).[48]  The task has been described by one court as follows:

> A trier of fact first determines which version [of the facts] is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by [the] probability that it may be sustainable only in part or not at all.

In re Ralph Lauren, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (quoting In re Windsor Plumbing Supply Co., Inc., 170 B.R. 503, 521 (Bankr.E.D.N.Y.1994)) (alterations in original).  The court makes no definitive findings but rather assesses the possibilities of the various contentions and applies the appropriate discount to reflect the uncertainties of the contingencies.  However, in performing this task, the court is bound by the legal rules which

---

[48]  The seminal estimation case in this Circuit is Bitner v. Borne Chemical Company, 691 F.2d 134 (3d Cir. 1982).  Although decided under § 502(c), the Court's guidance is applicable here. It states:

> The Code, the Rules of Bankruptcy Procedure, 11 U.S.C. app. (1977), and the Suggested Interim Bankruptcy Rules, 11 U.S.C.A. (1982), are silent as to the manner in which contingent or unliquidated claims are to be estimated.  Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue.  The principal consideration must be an accommodation to the underlying purposes of the Code. It is conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate evaluation of the claims. See 3 Collier on Bankruptcy ¶ 502.03 (15th ed. 1981).  Such methods, however, usually will run counter to the efficient administration of the bankrupt's estate and where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value.  In so doing, the court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. [citation omitted]. However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code.

Id. at 135-36.

govern the ultimate value of the claim.  Id.  See also In re Brints Cotton Marketing, Inc., 737

F.2d 1338, 1341 (5th Cir. 1984); Bitner, supra.  The applicable burdens of proof are also not

defined in the Bankruptcy Code or Rules, and while they have been placed on the claimant

by some courts and the objector by others, the better view is they should be consistent with

the burdens of proof in claim litigation.[49]  In the end, the goal of estimation is to fix a value

on the claim that will ensure that voting power is commensurate with the claimant's

economic interest.  Pension Benefit Guaranty Corp. v. Enron, 2004 WL 2434928, at *5

(S.D.N.Y. Nov. 1, 2004).

Application of these amorphous rules in this case presents challenges beyond whether

the Consumers will be able to convince me that their legal theories for liability under state

and federal usury laws will be sustained.  To estimate the Consumer's claim, I would also

need to determine the likelihood of class certification,[50] the number of prospective class

members, the class period, the individual damages to each member based on the interest

---

[49]  I agree with the reasoning of the Court in FRG that the burdens should be the same as in
deciding objections to proofs of claim which the estimation proceeding seeks to emulate in summary
fashion.  121 B.R. at 456-457.  Bankruptcy Rule of Procedure 3001(f) provides that a proof of claim
executed and filed in accordance with the rules of procedure constitutes prima facie evidence of the
validity and amount of the claim.  The objecting party carries the burden of going forward with
evidence in support of its objection which must be of probative force equal to that of the allegations
of the creditor's proof of claim.  If the objecting party succeeds in overcoming the prima facie effect
of the proof of claim, the ultimate burden of persuasion then rests on the claimant.  In re Allegheny
International, Inc., 954 F.2d 167, 174 (3d Cir. 1992).  However, where requisite documentation is
not attached to the proof of claim, it may be deprived of its prima facie validity and the burden will
therefore remain with the claimant.  Heath v. American Express Travel Related Services Company,
Inc. (In re Heath), 331 B.R. 424, 433-34 (9th Cir. BAP 2005) (citing cases).

[50]  This involves not only the likelihood of establishing the Rule 23 criteria (i.e., numerosity,
typicality, adequacy of representation and predominance) but the likelihood of finding that the
provision in the Consumers' loan contract that waives the class action remedy is unenforceable.
This latter issue is inextricably tied with the Debtor's pending Arbitration Motion.

charges they paid (which requires a determination of the number of rollover loans they received) and the availability of treble damages.

The Consumers have claimed damages of $7,650,000 which their counsel indicated was premised on a class of 14,000 borrowers with claims of $540 each based on illegal interest charges of $180 trebled. The Consumers sought to establish the component parts of the damages through various documents. As I presaged at the hearing, I had difficulty, based on the estimation hearing record, rendering a reasoned estimation of the Consumers' claim. Significantly, however, the confirmation record established that this deficiency was irrelevant. Having found that the Plan is unconfirmable under § 1129(a)(3) and (11), determination of the Estimation Motion is not necessary to the outcome of the Debtor's request for confirmation. Thus, my preliminary conclusion that estimation was necessary to avoid delay in the administration of the case must be reconsidered.

In Menard-Sanford v. Mabey (In re A.H. Robins Corp.), 880 F.2d 694 (4th Cir. 1989) and Kane v. Johns Manville Corp. (In re Manville Corp.), 843 F.2d 636 (2d Cir. 1988), the appellate courts considered a challenge to the estimation of asbestos tort class claims at $1 each. Neither court ruled on the contention that the procedures were arbitrary but rather found that the procedures were irrelevant because the plan was overwhelmingly accepted and alternative procedures would not have altered the outcome of the vote. While this case is distinguishable in the sense that the amount of the claim could affect the outcome of the vote of Class 3, the ultimate conclusion that estimation is not relevant is the same. Since the

-43-

outcome of the vote will not affect the outcome of confirmation, there is no present

need to estimate the claim.  See In re Goldstein, 114 B.R. 430, 434 (Bankr. E.D. Pa. 1990)

(court refuses to employ temporary allowance process under Bankruptcy Rule 3018(a)

finding no urgency surrounding confirmation).[51]

With confirmation denied, the Debtor must go back to the drawing board and

determine whether it will file an amended plan.  If it does not file an amended plan, the

reorganization case may be short-lived.  In a Chapter 7 case, there would be no reason to

estimate the claim.  Rather the claim would be liquidated at the trial of the Class Action.

On the other hand, if the Debtor does file an amended plan, it may be acceptable to the

Consumers, thus obviating temporary allowance for voting purposes.  In re Dow Corning

Corp., 211 B.R. 545, 546 (Bankr. E.D. Mich. 1997). [52] If the Plan is still not acceptable, the

status of the Class Action will nonetheless be more advanced rendering the estimation

determinations less speculative.

Following the briefing of the contested confirmation issues and the Estimation

Motion, the parties undertook to make a documentary record on the pending Arbitration

---

[51]  Based on the Debtor's template for its reorganization which entails a merger into the
Subsidiary with the Subsidiary the remaining entity and conducting payday operations pursuant to
its Delaware license, I see no business urgency to securing confirmation.  Since all creditors but the
Consumers are guaranteed payment by the Frascella Brothers (and indeed many are being currently
paid), they are not prejudiced by the deferral of confirmation.  Before the record was made on
confirmation, I was not aware of these facts.

[52]  Since the Debtor has proposed a "pot plan" with a *pro rata* distribution on account of
allowed claims, liquidation of the Consumer Claim would not be necessary under § 502.

Motion.[53] That matter has very recently become ripe for decision.  Both parties have argued

long and hard in support of their respective views on the enforceability of arbitration,

believing that the outcome of the venue will impact the outcome of the Class Action.[54]

The issues I am now poised to address in the pending Arbitration Motion are related to issues

I must consider in seeking to estimate the Consumers' claim.  I am loathe to presage my

views on these issues when the Arbitration Motion is ripe for decision based on a complete

record.  I am particularly reluctant because as discussed below, the record I have been

provided is so inadequate that the assessment of possibilities would in many respects be

guesswork that would not serve the ends of justice.  FRG, supra, 121 B.R. at 458-459 (court

temporarily denies claims where the claimant has totally failed to quantify it).

The Debtor is not to be encouraged and the Consumers not to be discouraged by this

conclusion.  It only reflects the state of the record to date.  There are many difficult bridges

to cross on the road to liability, bridges that will be better built on a record developed

after complete discovery and trial (or arbitration) record.  As noted, the estimation of the

Consumer's claim is not necessary to the adjudication of this contested confirmation.

Presumably if the Debtor proposes a new plan that seeks to overcome the flaws of the Plan,

---

[53]  Pursuant to Stipulation approved by the Court on September 6, 2006, the parties agreed
to a 60 day discovery period limited to the Consumers' allegations that the arbitration clause in the
Consumers' notes is unconscionable.  A briefing schedule then followed.  Adv. No. 06-101,
Doc. No. 37.  The last submission was made on January 23, 2007.

[54]  Indeed the Debtor has speculated that enforcement of the arbitration clause will result in
the abandonment of the Class Complaint against the Debtor and the filing of a new Complaint
against non-debtor parties that would not be subject to federal court jurisdiction.

it will either secure the Consumers support or the Consumers will be able, with the guidance of this Opinion, to build a record that will leave less to supposition and more to fact.

## CONCLUSION

For the foregoing reasons, I conclude that the Debtor has not sustained its burden of establishing that its Amended Plan of Reorganization of Frascella Enterprises, Inc. satisfies the statutory confirmation requirements set forth in 11 U.S.C. § 1129(a). Accordingly, confirmation of the Plan is denied. The Debtor is given leave to file by March 5, 2007 an amended disclosure statement and plan that will overcome the deficiencies noted above. In such case, Consumers may renew their motion to estimate their claim. In the absence of such amendment, a status conference shall be held on March 12 , 2007 to discuss the future of this Chapter 11 case.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:  February 8, 2007

-46-

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :        Chapter 11
                                         :
FRASCELLA ENTERPRISES, INC.,             :        Bankruptcy No. 06-10322DWS
dba Cash Today,                          :
                                         :
        Debtor.                          :

_____

# ORDER

**AND NOW**, this 8th day of February 2007, upon consideration of (1) the request for confirmation of the Amended Plan of Reorganization (the "Plan") proposed by Frascella Enterprises, Inc. d/b/a Cash Today (the "Debtor") and (2) the Motion of creditors Lawrence Turner, Linda Davis and Demyri Hill (together with the class they seek to represent, the "Consumers") for Estimation of their Class Claim ("Estimation Motion"); after notice and hearing, and for the reasons stated in the accompanying Opinion;

It is hereby **ORDERED** that:

1. Confirmation of the Plan is **DENIED**;

2. The Debtor is given leave to file by **March 5, 2007** an amended disclosure statement and plan; and

3. Absence such amendment, a status conference shall be held on **March 12, 2007 at 9:30 a.m.** to discuss the future of this Chapter 11 case.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge